UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


DEMA G. BEHNAM,

      Plaintiff,                     Case No. 1:20-cv-12876

                                    District Judge Thomas L. Ludington

v.                              Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

This is a social security case.  Plaintiff Dema G. Behnam brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for disabled adult child (DAC) benefits under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 23, 26), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Behnam was not disabled under

1

the Act during the relevant period.  Accordingly, it is RECOMMENDED that the

Commissioner's Motion for Summary Judgment (ECF No. 26) be GRANTED,

Behnam's Motion for Summary Judgment (ECF No. 23) be DENIED, and the

ALJ's decision be AFFIRMED.

## II.     Background

As an initial matter, Behnam applied for both Social Security Insurance

(SSI) and DAC benefits.  Although her application for DAC benefits was denied,

her application for SSI was approved with an alleged onset date of November 5,

2018.  (ECF No. 16-3, PageID.131, 143, 148).  As will be further explained below,

in order to obtain DAC benefits, Behnam was required to show that she was

disabled under the Act prior to turning 22 on July 22, 2013.

### A.     Procedural History

Behnam was 21 years old at the time of her alleged onset date of June 22,

2013.  (ECF No. 16-3, PageID.123).  She previously worked as a bagger,

caregiver, and food line worker.  (ECF No. 16-6, PageID.281).  Behnam alleged

disability due to heart failure.  (ECF No. 16-3, PageID.123).

After Behnam's application for DAC benefits was denied at the initial level

on May 7, 2019 (ECF No. 16-2, PageID.300), she timely requested an

administrative hearing, which was held on December 17, 2019, before the ALJ.

(ECF No. 16-2, PageID.100-117).  Behnam testified at the hearing, as did a vocational expert (VE).  (*Id.*).

Behnam testified that she lived with her parents and older sister.  (*Id.*, PageID.107).  She had a bachelor's degree and fell two semesters short of the completion of a master's degree in occupational therapy.  (*Id.*).  When Behnam was in school, she attended classes fulltime and worked parttime.  (*Id.*, PageID.107-108).  Behnam had a car and was able to drive.  (*Id.*, PageID.107).

Behnam indicated that when she reflected on the period prior to her 22nd birthday, she realized it took her longer to walk than her friends.  (*Id.*, PageID.109).  She also had to take five or six breaks when walking across campus.  (*Id.*).  Additionally, a full day of classes got "difficult towards the end."  (*Id.*, PageID.110).  Behnam would get tired after sitting for a long period of time and struggled with mental focus after a day of classes.  (*Id.*).  Sometimes while in a class, Behnam experienced heart palpitations.  (*Id.*, PageID.110-111).  When exerting herself, such as walking upstairs, Behnam experienced moments of dizziness.  (*Id.*, PageID.111).

On January 2, 2020, the ALJ issued a written decision finding that Behnam was not disabled.  (*Id.*, PageID.82-98).  On July 30, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

(*Id.*, PageID.71-75).  Behnam timely filed for judicial review of the final decision.
(ECF No. 1).

### B.   Medical Evidence[1]

Behnam has "complex congenital heart disease consisting of L-transposition

of the great arteries, ventricular septal defect, and pulmonary stenosis, status post

double switch operation, right Glenn anastomosis, and aortic valve replacement in

2002.  She underwent repeat aortic valve replacement in 2009."  (ECF No. 16-7,

PageID.366).  She regularly treated with the Pediatric Cardiology Clinic at Mott

Children's Hospital after moving to Michigan.

Records from the Pediatric Cardiology Clinic reflect that Behnam "was

doing very well from a cardiovascular perspective" in August 2010.  (*Id.*).  In July

2011, "[Behnam] report[ed] that she ha[d] continued to do well over the past year."

(*Id.*).  She indicated that she did not exercise much, but that she had "good energy

in going about her normal activities."  (*Id.*).  "[Behnam] denie[d] any chest pain,

shortness of breath, palpitations, dizziness or syncope overt the past year."  (*Id.*).

"Her echocardiogram was essentially unchanged from last year with mild to

---

[1] Behnam turned 22 years old on July 22, 2013, making her date of last insured
July 21, 2013.  (ECF No. 16-2, PageID.87, 90).  Accordingly, this Report will
summarize the medical evidence dated July 21, 2013 or earlier in addition to the
retrospective medical opinion submitted by Behnam's treating provider.  *See
Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012)
("In determining whether a Plaintiff is 'disabled,' the ALJ generally only considers
evidence from the alleged disability onset date through the date last insured.").

4

moderately depressed left ventricular function." (*Id.*, PageID.367).  Behnam was instructed to continue taking Enalapril and to increase her Coumadin dose.  (*Id.*). She was told to "self-limit her exertion as needed," but was given no activity restrictions.  (*Id.*).

Primary care records from August 2011 reflect that Behnam was feeling well and had no complaints.  (*Id.*, PageID.380).  Behnam ate a balanced diet but did not exercise.  (*Id.*).  Behnam denied fatigue.  (*Id.*).  An August 2011 CT scan of Behnam's chest had the following conclusions:

> 1. There [was] no evidence of pulmonary mass or module or enlarged hilar or superior mediastinal lymph nodes.
> 2. Cardiovascular findings compatible with a patient with congenital heart disease with previous surgery.

(*Id.*, PageID.408).

August 2012 records from the Pediatric Cardiology Clinic indicate that Behnam "felt well" since her last appointment.  (*Id.*, PageID.391).  "She denie[d] palpitations, syncope, chest pain, and leg swelling."  (*Id.*).  Behnam reported that she did not exercise due to "being lazy," however, when she was active, she did not experience "early fatigue."  (*Id.*).  Behnam was taking Enalapril and Coumadin.  (*Id.*).  It was noted that Behnam's "exam and echocardiogram [were] essentially unchanged."  (*Id.*, PageID.395).

June 2013 records from the Pediatric Cardiology Clinic indicate that Behnam "ha[d] been doing well" since her last visit.  (ECF No. 16-14,

5

PageID.1292).  However, Behnam did "report[] being a little more tired during mid-day since September."  (*Id*.).  She had stopped going to the gym and was not otherwise very active.  (*Id*.).  "She ha[d] no presyncope (some presyncope when she [was] dehydrated), no chest pain, no shortness of breath, no palpitations, and no leg swelling."  (*Id*.).  Additionally, Behnam "report[ed] that she misse[d] about one [dose] of Coumadin each month, however it may be more."  (*Id*.)

Further, a June 2013 echocardiogram was described as a "[t]echnically very difficult study" and showed prosthetic neo-aortic valve with moderate stenosis, mild neo-aortic insufficiency, and dilated morphologic left ventrical with at least moderately depressed systolic function.  (ECF No. 16-15, PageID.1569).  Additionally, an EKG showed levo-transposition of great arteries with ventricular inversion and ventricular septal defect.  (*Id*.).

On November 26, 2019, Mark D. Norris, M.D., M.S. of the University of Michigan Adult Congenital Heart Program authored a letter assessing Behnam's medical condition and physical abilities.  (ECF No. 16-16, PageID.1723-1724).  Dr. Norris stated that if Behnam had been under his care as of the date she turned 22 years old, he "would have placed limitations on her ability to lift and carry.  In addition [he] would expect that her ability to walk would also be limited and require frequent rest."  (*Id*., PageID.1723).  Dr. Norris further noted that Behnam's

"congenital cardiac condition [was] lifelong, and she has had physical limitations and reduced exercise capacity since birth." (*Id*.).

III.    Framework for Disabled Adult Child Disability Determinations

DAC benefits are available "if such child was under a disability . . . at the time [s]he attained the age of 18 or if [s]he was not under such a disability . . . at such time but was under a disability . . . at or prior to the time [s]he attained . . . the age of 22." 42 U.S.C. § 402(d)(1)(G); *see* 20 C.F.R. § 404.350(a)(5).  In substance, section 402(d) "provides that a child of an individual entitled to old age or disability insurance benefits is entitled to Child's Insurance Benefits if [s]he is under a disability (as defined by section 223(d) of the Social Security Act) which began before h[er] twenty-second birthday." *Jones v. Sec'y of Health & Human Servs.*, 89–1603, 1990 WL 17265, at * 1 n.1 (6th Cir. Feb. 27, 1990); *see Wallin v. Astrue*, No. 12-cv-142, 2013 WL 209183, at * 2 (E.D. Wash. Jan. 17, 2013) (The "claimant must prove her disability began on or before her 22nd birthday.").

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant, including a disabled adult child, is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in

20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can

perform her past relevant work in light of her residual functional capacity (RFC);

and (5) if not, whether, based on the claimant's age, education, and work

experience, she can perform other work found in the national economy.  20 C.F.R.

§ 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-643

(6th Cir. 2006).  The claimant bears the ultimate burden of producing sufficient

evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §

404.1512(a).  Specifically, the claimant has the burden of proof in steps one

through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at step five to establish whether the

claimant has the residual functional capacity to perform available work in the

national economy.  *Id.*

Following this five-step sequential analysis, the ALJ found that Behnam was

not disabled under the Act during the relevant period.  At Step One, the ALJ found

that Behnam had not engaged in substantial gainful activity since June 22, 2013

(alleged onset date).  (ECF No. 16-2, PageID.87).  At Step Two, the ALJ found

that she had the severe impairment of complex congenital heart disease.  (*Id*.,

PageID.88).  At Step Three, the ALJ found that Behnam's impairment did not meet

or medically equal a listed impairment.  (*Id*.).

The ALJ then assessed Behnam's RFC, concluding that she was capable of performing "sedentary work as defined in 20 CFR 404.1567(a) except [Behnam]:

- Should have no exposure to extreme cold or heat
- Can have only occasional exposure to respiratory irritants
- Should have no exposure to workplace hazards
- Can occasionally climb ramps or stairs;
- Can never climb ladders, ropes, or scaffolds;
- Can only occasionally balance, stoop, kneel, and crouch; and
- Can never crawl."

(*Id*., PageID.88-89).

At Step Four, the ALJ found that Behnam had no past relevant work.  (*Id*., PageID.93).  At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Behnam was capable of performing the jobs of telephone quotation clerk (900,000 jobs nationally), final assembler (200,000 jobs nationally), and nut sorter (450,000 jobs nationally).  (*Id*., PageID.93-94).  As a result, the ALJ concluded that Behnam was not disabled under the Act.  (*Id*., PageID.94).

IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.  And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.  Substantial evidence, this Court has
> said, is more than a mere scintilla.  It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . .

. presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.") (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

## V.    Analysis

Behnam presents three arguments in support of her motion for summary judgment: (1) whether the ALJ erred at Step Five; (2) whether the ALJ erred in evaluating the opinion evidence; and (3) whether the ALJ erred in evaluating Behnam subjective symptoms. In response, the Commissioner argues: (1) the ALJ

11

was free to rely on the VE's unchallenged testimony; (2) the ALJ properly weighed the opinion evidence; and (3) the ALJ properly evaluated Behnam's subjective symptoms.  Each argument is addressed in turn below.

## A.    Step Five

Behnam's first argument is that the ALJ erred in relying on the VE's testimony that there were many suitable jobs in the national economy.  This is because the VE offered job numbers from the Occupational Employment Statistics (OES)/Standard Occupational Classification (SOC) group, not the specific Dictionary of Occupation Titles (DOT).

"To obtain a job-numbers estimate, a vocational expert may consult a publication like the DOT." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1281 (11th Cir. 2020); *see* 20 C.F.R. § 416.966(d)(1).  "The DOT groups jobs into 'occupations' based on their similarities and assigns each occupation a code number." *Id*.  The court in *Goode* went on to explain:

> Aside from being three decades old, the DOT presents other difficulties. DOT codes, for example, do not provide statistical information about the number of jobs available in the national economy.  Instead, the vocational expert must look to other sources like the Occupational Employment Quarterly (OEQ), which is compiled by a private organization called U.S. Publishing, to find employment statistics. *See Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014); *Brault v. Soc. Sec. Adm.*, 683 F.3d 443, 446 (2d Cir. 2012).  The OEQ database, however, does not compile data by DOT codes, but rather through the Standard Occupational Classification (SOC) system. *See Brault*, 683 F.3d at 446; Occupational Employment Statistics, Bureau of Labor Statistics, https://www.bls.gov/oes/ (last visited April 30, 2020).

The SOC system groups together detailed occupations with similar job duties. As a result, a single SOC group may contain multiple DOT occupations. *See Herrmann*, 772 F.3d at 1113–14. In the words of the Seventh Circuit, "[t]he use of one system to supply the job titles and another [system] to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist." *Chavez*, 895 F.3d at 965. *See also Brault*, 683 F.3d at 447 n.4 (noting the "information loss" that results from the "many-to-one mapping" between the DOT and SOC codes, and explaining that any estimate of existing jobs "may deviate significantly from the actual number of existing positions"). To provide some assistance in this regard, the Bureau of Labor Statistics has published a crosswalk which provides the corresponding SOC group code for each DOT occupation. *See* DOT Crosswalk Search, O*NET OnLine, https://www.onetonline.org/crosswalk/DOT/ (last visited April 30, 2020).

*Goode*, 966 F.3d at 1281.

Further, "a vocational expert, after figuring out the total number of jobs in an SOC group, needs to take an additional step to approximate how many of those are the specific job or jobs that the claimant could perform." *Id*. at 1283. "In other words, the vocational expert 'must use some method for associating SOC-based employment numbers to DOT-based job types.' " *Id*. (quoting *Brault*, 683 F.3d at 446). This is where Behnam claims that the VE in this case erred. Meaning that the VE, after figuring out the total number of jobs in the SOC group, failed to take an additional step to approximate how many of those are the specific job or jobs that Behnam could perform. However, even assuming this argument is correct, at no point during the hearing before the ALJ did Behnam's counsel challenge the VE's testimony regarding job numbers.

While the Sixth Circuit has not considered the question of whether a claimant must challenge a VE's testimony regarding job numbers at the administrative level, the Ninth Circuit has considered this question.  The Ninth Circuit in *Shabi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017), held "that when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant forfeits such a challenge on appeal, at least when that claimant is represented by counsel."  Here, Behnam was represented by attorney Clifford L. Weisberg at her hearing before the ALJ and Weisberg failed to challenge the VE's job numbers during administrative proceedings before the agency.  (ECF No. 16-2, PageID.85).  Thus, at least under Ninth Circuit precedent, Behnam cannot now attempt to challenge the VE's job numbers.

The requirement that a claimant must raise a job number challenge administratively finds support in the case most heavily relied on by Behnam, *Springer v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 766-767 (E.D. Mich. 2020).  Behnam believes *Springer* is particularly instructive because it involved testimony by the same VE who testified in this case.  In *Springer*, the district court remanded for rehearing "for the limited purpose of conducting another Step Five analysis."  *Id*. at 768.  Notably, in *Springer*, the claimant's hearing counsel extensively questioned the VE regarding her job number testimony before being forced to

14

move on by the ALJ.  *Id*. at 766-767.  As the district court noted, "Springer raised substantial questions concerning the reliability of the VE's testimony."  *Id*. at 766. Here, by contrast, Behnam did not raise substantial questions concerning the reliability of the VE's testimony therefore distinguishing this case from *Springer*.

Further, in *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 318 (6th Cir. 2020), the Sixth Circuit considered whether a plaintiff could argue that a surveillance-system monitor job was obsolete even though the plaintiff did not cross-examine the VE about the job at the hearing.  The court explained:

> O'Neal had a chance to cross-examine the vocational expert during the hearing, and he did not.  We cannot know if cross-examination would have suggested that the surveillance-system monitor job was in fact obsolete.  For example, a cross-examination could have shown that the surveillance-system monitor job requires far more training than it did when the DOT was created.

> Because the DOT continues to be recognized as a source of reliable job information and O'Neal did not cross-examine the vocational expert when he had the opportunity, the vocational expert's testimony constitutes substantial evidence to support the ALJ's finding that O'Neal was able to perform work that existed in significant numbers in the national economy.

*Id*.  Following, the example of the Ninth Circuit and *O'Neal*, the undersigned rejects Behnam's Step Five argument because of her failure to raise the issue administratively by, for example, cross-examining the VE regarding the job numbers.

15

B.     Opinion Evidence

Next, Behnam argues that the ALJ erred in evaluating the opinion evidence.

Under the current regulations, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b). The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. § 404.1520c(c). Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision. § 404.1520c(b)(2).

There are two relevant opinions in this case. The first is by Dr. Keith Camann. The ALJ evaluated his opinion as follows:

> In May 2019, Keith Camann opined that from June 2009 through July 2013, the claimant could occasionally lift or carry 20 pounds, and that she could sit, stand, or walk for approximately 6 hours in an 8-hour workday. He also concluded that the claimant could frequently balance or climb ramps or stairs, but only occasionally stoop, kneel, crouch, and crawl. He also indicated that the claimant should never climb ladders, ropes, or scaffolds, and that she should avoid concentrated exposure to extreme temperatures and pulmonary irritants. Lastly, he noted that the claimant should avoid all exposure to hazards. Dr. Camann's assessment is consistent with the record as a whole, including the claimant's largely normal treatment records prior to the relevant period, and her lack of consistent treatment during the relevant period. However, as a precautionary measure and to account for the claimant's testimony that she experienced occasional dizziness and fatigue, the

16

undersigned has conservatively limited the claimant to the sedentary exertional level.  Accordingly, his opinion is less persuasive.

(ECF No. 16-2, PageID.92 (internal citations omitted)).

Behnam seemingly argues that the ALJ erred when she assumed that Behnam's testimony regarding occasional dizziness and fatigue was inconsistent with Dr. Camann's opinion.  This is because Dr. Camann found Behnam's statements regarding fatigue and shortness of breath to be fully consistent with the medical record.  (ECF No. 16-3, PageID.144).  However, any misstatement in this regard is harmless.  The ALJ found Dr. Camann's opinion "less persuasive" in regard to Behnam's subjective symptoms in order to assess additional functional limitations.  Thus, any error was in Behnam's favor.  Further, Dr. Camann did not address the symptom of dizziness.  The ALJ credited Behnam's testimony regarding occasional dizziness and therefore assessed additional limitations in her favor.

The other opinion in this case is Dr. Norris' retrospective opinion.  The ALJ evaluated his opinion as follows:

> In November 2019, Mark D. Norris, M.D., M.S., authored an assessment of the claimant's physical abilities.  He stated that as of the claimant's 22nd birthday, he would have placed limitations on her ability to lift, carry, and walk (noting that she required frequent rest).  He stated that her restrictions would be indefinite, and opined that the claimant may currently be able to perform repetitive lifting of 10 pounds with more sporadic lifting of 25 pounds.  Dr. Norris stated that rest periods would be required at an "unknown frequency and duration," but that they would occur when she felt short of breath,

dizzy, or fatigued.  However, Dr. Norris's indication that he would have placed limitations on the claimant's ability to lift, carry, and walk is unsupported, as a targeted review of the record does not demonstrate that that Dr. Norris ever treated the claimant during the relevant time period, nor the time preceding the relevant time period.  As such, his limitations are not supported by evidence regarding the claimant's actual condition at the time.  Nevertheless, even if the undersigned were to accept his proposed limitations, the limitations as of the claimant's 22nd birthday contain no temporal or objective aspects.  It is unclear how much the claimant could lift, carry, or walk at that time. Accordingly, the undersigned finds his opinion unsupported, vague, and ultimately unpersuasive.

(ECF No. 16-2, PageID.62 (internal citations omitted)).

Behnam appears to fault the ALJ for considering that Dr. Norris did not treat Behnam during the relevant period.  However, the ALJ did not err by noting that Dr. Norris' opinion pertained to a period predating the treating relationship.  *See* § 404.1520c(c) (opining source's relationship with a claimant is a relevant factor to be considered in evaluating opinion's persuasiveness).  Further, it is true that Dr. Norris' restrictions were largely nonspecific and thus difficult to incorporate into the RFC.  For instance, he opined that "would have placed limitations on her ability to lift and carry.  In addition [he] would expect that her ability to walk would also be limited and require frequent rest."  (ECF No. 16-16, PageID.1723). However, this opinion does not specify, for example, how much Behnam could lift or how far she could walk.

For these reasons, the ALJ did not err in the assessment of the opinion evidence.

C.    Subjective Symptoms

Behnam's last argument is that the ALJ erred in evaluating her subjective

symptoms.

Under the Social Security Regulations (SSR), the ALJ was required to

follow a two-step process when evaluating Behnam's subjective symptoms.  20

C.F.R. §§ 404.1529(a), 416.929(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16,

2016).  Under SSR 16-3p, an ALJ must analyze the consistency of the claimant's

statements with the other record evidence, considering her testimony about pain or

other symptoms with the rest of the relevant evidence in the record and factors

outlined in SSR 16-3p.  This analysis and the conclusions drawn from it – formerly

termed a "credibility" determination – can be disturbed only for a "compelling

reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see

also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)

(explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' . . .

to 'clarify that subjective symptom evaluation is not an examination of an

individual's character.' ").

The ALJ must first confirm that objective medical evidence of the

underlying condition exists, and then determine whether that condition could

reasonably be expected to produce the alleged subjective symptom, considering

other evidence, including: (1) daily activities; (2) location, duration, frequency, and

19

intensity of the symptom; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6) any means used to relieve the symptom; and (7) other factors concerning functional limitations.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

Here, Behnam testified that when she reflected on the period before her 22nd birthday she realized it took her longer to walk than her friends.  (ECF No. 16-2, PageID.109).  She also had to take five or six breaks when walking across campus.  (*Id.*).  Additionally, a full day of classes got "difficult towards the end."  (*Id.*, PageID.110).  Behnam would get tired after sitting for a long period of time and struggled with mental focus after a day of classes.  (*Id.*).  Sometimes while in a class, Behnam experienced heart palpitations.  (*Id.*, PageID.110-111).  When exerting herself, such as walking upstairs, Behnam experienced moments of dizziness.  (*Id.*, PageID.111).

The ALJ appeared to credit Behnam's subjective symptoms when limiting her to sedentary work.  For example, the ALJ states that "as a precautionary measure and to account for the claimant's testimony that she experienced occasional dizziness and fatigue, the undersigned has conservatively limited the claimant to the sedentary exertional level."  (*Id.*, PageID.92).  It is not clear from Behnam's brief how the ALJ should have further accounted for Behnam's

20

subjective symptoms.  Thus, the ALJ did not err in evaluating Behnam's subjective symptoms.

### D.    In Sum

The record establishes that Behnam has the severe impairment of a complex congenital heart disease.  However, during the relevant period, i.e. prior to turning age 22, this severe impairment was not disabling.  Indeed, Behnam attended college full time and worked part-time during that time.  The medical evidence shows her heart condition at that time was controlled, or at least not disabling.  As the ALJ put it: "I am not saying that she was without symptoms; I am saying that the level of her functioning during the relevant period was extremely high and totally inconsistent with disability through the [date of last insured] for this DAC claim."  (ECF No. 16-2, PageID.88).  Ultimately, all of the ALJ's determinations were within the "zone of choice" accorded to the fact-finder at the administrative hearing level and they should not be disturbed by this Court.  *Blakley, supra,* 581 F.3d at 406.

### VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the Commissioner's motion be GRANTED, Behnam's motion be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

Dated: February 16, 2022                    s/Kimberly G. Altman
Detroit, Michigan                           KIMBERLY G. ALTMAN
                                            United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 16, 2022.

<u>s/Carolyn Ciesla</u>
CAROLYN CIESLA
Case Manager